I'm Judge Gould presiding today and I'm delighted to be sitting with Judge Gilman who's on remotely and with Judge Miller. And before we start I want to say how much our court appreciates Judge Gilman taking time from his busy calendar and docket to help us out here. I also before we start want to comment to the lawyers that the court appreciates lawyers helping us out with their advocacy which is a brave thing to do in the time of pandemic and we appreciate it. The only bonus I can give you in my power is to say if you need a few minutes extra for your arguments just ask and it shall be received. Also for planning purposes the court will take a break after the massage envy case is argued. So we'll start now with the first case on our docket is Michelle Schwartz-Tallard v. HSBC Bank and that case number 1917-151 is submitted on the briefs. The next case on our calendar which is being argued is, I don't know if I'm pronouncing this right, but Belieu v. Saul, social security case. For the plaintiff appellant we have Mr. Tree and for the government we have Mr. Phillips. So without further discussion I'll just say that case was set for 10 minutes per side. So Mr. Tree if you want to make a rebuttal argument then you should try to stop before all your time is used up. But as I said I'm a bit of a softy during pandemics. So we'll let you handle it as you wish. So Mr. Tree could please proceed. Thank you, your honors. It's a pleasure to be before you today. I would like to reserve two minutes for a rebuttal. I'm representing Eric Belieu. As a young child Mr. Belieu developed a rare mass cell disorder, urticaria pigmentosa, which I'll refer to during my oral argument in its abbreviated form UP or UP. This disorder very seriously affected Belieu in his formative years and he almost died from it. But as happens for almost all children with UP who are the people that mostly get UP, this disease went into remission. Belieu was in special education and only completed the eighth grade. Despite these challenges to Mr. Belieu, he did work in 22 different years from his teenage years up until he turned 41 years of age. UP is seen in only one in 200,000 people. So if you have a city of 200,000, you're likely to have one person with UP. So a community of doctors, of many hundreds of doctors that treats 200,000 people, only one doctor, maybe two because of the specialists getting involved, will see UP. As with most all diseases, UP symptoms vary from mild to very debilitating. Belieu becomes very debilitated from the symptoms UP when he has a flare-up. His entire body hurts and the rash on his skin burns. During flare-ups he's unable to work. Each medical provider that applied regarding attendance and persistence noticed significant deficits. This is important because the vocational expert testified if a person misses more than one day of work per month, they'll not be able to sustain competitive employment. And if they're off task over 10% of the time, they would not be able to sustain competitive employment. His treating medical provider, Michelle Womick, a physician's assistant, opined that if he had a job to go to, he would miss four or more days of work per month due to his symptoms. Consistent with this opinion, Dr. Marks opined that Belieu had a very significant limitation in his ability to maintain regular attendance. Dr. Eisenhower also consistently opined he had a significant limitation in his ability to maintain regular attendance. Dr. Haney and Dr. Flanagan, both state agency physicians, stated that Belieu's depression and low energy would interfere with his ability to maintain regular attendance and to persist through a normal work week. Dr. Haney and Flanagan also found that they felt he could work, but the problem here is that they're not vocational experts. They gave a limitation that his condition would interfere with his ability to maintain regular attendance. The vocational expert testified that even missing one day of work per month would make him unable to sustain employment. The problem here is the judge didn't reject any of these opinions regarding attendance, didn't discuss them, and he didn't incorporate them into his RFC. So that was significant error. I should stand to correct. He did reject Dr. Marks and Dr. Womack, but he didn't reject Dr. Sawyer, Dr. Eisenhower, Dr. Haney, or Dr. Flanagan's statements regarding persistence and attendance. Regarding Dr. Marks, the ALJ gave three reasons to reject Dr. Marks. First, he stated, Dr. Marks' examination was performed for a different program with less stringent requirements. As the federal court noted, this was error for the ALJ to so reject Dr. Marks for this reason. The ALJ didn't state what the requirements were for the program. In fact, the program that Mr. Ballou was applying for was the Aged, Blind, and Disabled program that the state of Washington offers for its residents. It pays them $197 a month if they're found eligible for ABD, which Mr. Ballou was. In Washington Administrative Code 3884490001, it clearly states that ABD uses the same SSA disability criteria as the Social Security Administration does, including the same definition of disability and the five-step sequential process. So not only did the ALJ not discuss what the difference was, he was dead wrong. Second, the ALJ rejected Dr. Marks because he stated that Dr. Marks' opinion was on a checkbox form. As indicated, the ALJ gave significant weight to Dr. Eisenhower, was on a much-abbreviated form, and gave weight to the state agency positions, which were on checkbox forms. In addition, the Ninth Circus has indicated that the form should not provide a difference.  Now in this checkbox form, it was six pages that included a lot of narrative discussion of his clinical findings, of his examination findings, as well as the functional limitations that were checked off that showed that he had a very significant limitation in attendance for work. So that was error. The final reason that the ALJ gave to reject Dr. Marks was because this was not consistent with the longitudinal record. However, this was consistent as we saw that Ms. Womack, Dr. Eisenhower, Dr. Haney, Dr. Flanagan, and Dr. Sawyer all gave consistent opinions regarding attendance. And that was the issue that the ALJ had, was that the Mark impairment with attendance, because that would be a disabling limitation. I'd like to talk... Can I just ask you about Dr. Sawyer? Maybe I'm confused as to who said what, but where did Dr. Sawyer say that there would be limitations on attendance? Because I'm looking at like, well, go ahead. I'm sorry, I didn't mean to interrupt you. No, please. Dr. Sawyer said he would have difficulty sustaining concentration and persisting in work-related activities at a reasonable pace. And so that has to do with his ability to perform at a reasonable pace in work-related activities and the BE's discussion that you can only be 10% off pass. Dr. Sawyer also stated he had difficulties with usual stress in the workplace, not abnormal stress or high stress. Like the ALJ said he wouldn't have to have high stress, but Dr. Sawyer said usual stress he would have difficulty performing in. Right. So, I mean, but I guess my question was narrower than that. I mean, that may be a significant limitation, but on the specific question of his ability to maintain attendance, Dr. Sawyer said that he would not have difficulty with that, didn't he? His difficulty, and I should have, yeah, you're right, I should have cleared that up. His difficulty was in persistence and being able to work at a normal pace and not being able to tolerate the normal stress. Those were the limitations that were to stay in mind, Dr. Sawyer. I stand corrected in that. I did want to say briefly, if I could, and I think this is a very significant point that demands remand in and of itself. In assessing Dr. LeBeau, who was the medical expert who never reviewed any of the record, the ALJ stated, and this is at ER 25, begin quote, he provided a thorough overview of the nature of the disease and its expected symptoms and complications, none of which is consistent with the claimant's symptom allegation. That is significant, because in the ALJ's mind, he thought Dr. LeBeau said that none of the claimant's symptoms were consistent with up, and that's clearly what the ALJ said at 25. Now, that miscolored his entire decision and his credibility and his assessment of the other medical experts, because Dr. LeBeau clearly stated that head congestion, headaches, diarrhea, nausea, vomiting, were all systems of up. And the defendant has conceded such in their briefing, that Dr. LeBeau did testify to that. So the ALJ just got it dead wrong when he said that Dr. LeBeau, all of his symptoms that Ballew complained of were not consistent with up. That was not right. I'll reserve the remaining time. Thank you very much. Thank you, Counsel. And for your planning purposes, although it says 35 seconds, we'll give you two minutes for rebuttal. Thank you, Your Honor. Okay, now we'll hear from the government. Thank you, Your Honor. Good morning. May it please the Court, I am Jacob Phillips, arguing on behalf of the Commissioner of Social Security Administration. I'd like to just dive into where Mr. Tree left off there with Dr. LeBeau. The ALJ called a medical expert to testify in this case to give some context for a rare disease, and that's what Dr. LeBeau did. And Dr. LeBeau did testify that headaches and diarrhea and itchy rashes are symptoms of the disease. What Dr. LeBeau did not testify to was that head-splitting daily migraines were symptoms of this disease, or that diarrhea resulting in incontinence and multiple trips to the restroom during the day were not symptoms of this disease. Dr. LeBeau testified that these are moderate symptoms, but that people can typically live a relatively normal life with people who have this disease. And that's what the medical records show. Why was it appropriate for the ALJ to credit Dr. LeBeau? I mean, you said he called on Dr. LeBeau as an expert, but Dr. LeBeau is not a specialist in dermatology. This is a very rare disease, so why was it appropriate to look to him as an expert and to credit his opinion over that of the treating physician who was a specialist in dermatology? Well, the treating physician, in this case the dermatologist, didn't provide an opinion in this case. We had an opinion from Ms. Womack, who was a physician assistant, I believe. And she opined, as Mr. Tree indicated, that Belle Ewe would miss up to four days a week and needed to lie down for hours a day due to fatigue. She didn't testify, she didn't give an opinion that he had debilitating diarrhea or headache symptoms. In this case, the ALJ did credit the opinion of Dr. Brown, state agency reviewing physician, who Belle Ewe is not, the opinion hasn't been challenged in this case. As for Dr. LeBeau, he wasn't a specialist, he wasn't a dermatologist, but he was an internist, and he was a medical doctor, and he did testify that he researched the disease. And he wasn't providing an opinion on plaintiff's functioning, per se, he was just giving background context for this rare condition to help the ALJ make a decision and interpret the records. And really, I would argue that even if you give no weight to Dr. LeBeau's statements, that doesn't change the outcome in this case. The records here speak for themselves. The ALJ's decision is still supported by the opinion from the state agency physical reviewing physician, so there's still substantial evidence. Dr. LeBeau's testimony did provide context, provided helpful context, and he testified that the condition causes moderate limitations, and that's what the records show in this case. So there's a stark difference between the allegations that Belle Ewe testified to, that he said were disabling, which included, he used very colorful language in his testimony and said that his rashes felt like a blowtorch burning his skin. But when you see him reporting his symptoms to his providers throughout the record, he's reporting that his rashes are itchy, so this is not consistent with his testimony. He testified that he had head splitting headaches four to five times a week, that felt like a sledgehammer was cracking his head open. Again, when you go to the medical records and look at what he's reporting, there are some references to headaches for which he took ibuprofen, but there aren't consistent reports of severe head pain. There aren't reports of migraines, which he also testified he had daily. So this is the... Counsel, could I interject a question, please? So as I understand you, you're saying even if we totally discount Dr. LeBeau that the record supports the government's position. Before I address that with you, I want to ask, is there a reason why we should credit testimony of a doctor who never reviewed the whole record? Yes, General, under this court's precedent, the opinion from a reviewing physician... Oh, I'm sorry, are you referring to Dr. LeBeau? Or are you referring to the state agency reviewing physician? To Dr. LeBeau. Yes, General, so in terms of Dr. LeBeau's testimony, again, he didn't offer any testimony regarding plaintiff-specific... I'm sorry, the appellant-specific limitations. His testimony was merely to provide background information on this rare cease. And so his testimony was intended to be more of a useful exercise. I mean, he was originally supposed to review the record, but he had some difficulties doing so, so he wasn't able to apply on this claimant-specific limitation. Let me ask you, what justified the ALJ in discounting the testimony of Womack, who was an effective treating provider here? Sure, so Ms. Womack provided an opinion. She opined that the claimant would be absent from work more than four days, four or more days per month. And she justified that, or she opined that he would have to lay down for up to a few hours a day due to fatigue. But the ALJ discounted that decision because it wasn't supported. So when you look at Dr. Womack or Ms. Womack's notes, she's reporting consistently that when LeBeau appears at appointments, he's appearing well, he's not in distress. She's not reporting her notes don't show that he is fatigued or that he has any symptoms or indications that would support her decision or her opinion that he would have to miss work routinely each month or that he'd have to lie down daily due to symptoms. The opinion was also inconsistent with the longitudinal record, which again showed that when he presented with rashes, even when he presented with rashes, the objective findings were typically normal. They don't show him having limitations that supported debilitating limitations in this case. So as for Dr. Marks, Mr. Tree argued that the ALJ's reasons in this case weren't valid. I would argue that the fact that Dr. Marks provided his opinion in a checkbox form, this court has found that where an opinion doesn't provide a good explanation for the resulting limitations, then that's a reason to discount the opinion. This is the case, this court's Ford's decision. In this case, Dr. Marks assessed marked limitations for instance in communication, but he didn't provide any explanation as to why he believed value was markedly limited in his ability to communicate. In fact, his objective findings showed that he had good speech, was well organized, he was cooperative. So the objective findings didn't square with the marked limitations that he assessed. The ALJ also noted that that decision was inconsistent with the longitudinal record. And again, when the court looks at the objective findings, throughout the record, they are consistently showing normal mental status examination findings, normal psychological findings. So they just aren't supporting these marked limitations that Dr. Marks assessed. I'd also like to address Mr. Tree's suggestion that the opinion of Dr. Womack, who opined that value would miss four more days, was consistent with opinions from the psychologist. I thought it was... Counsel, I thought it was Nurse Womack. Oh, I'm sorry. She was a PAC, a physician assistant, was my understanding. And she assessed him for physical limitations, but Mr. Tree is conflating her assessment that he might miss work due to physical limitations with the psychological opinions. And the psychological opinions didn't opine that he would miss work due to physical limitations. They didn't opine that he would miss work due to psychological limitations. They opined that value was capable of sustaining and persisting in tasks if he was limited to simple work. And that's what the ALJ limited him to. So the ALJ accommodated the opinions, aside from Dr. Marks, that he discounted. And I see that my time is about up, and I'll just conclude by saying that substantial evidence did support the ALJ's decision in this case, and we would ask that this court affirm, unless there are no further questions. If my colleagues don't have questions, I have none. Thank you, John. Well, I guess we'll let Mr. Tree make rebuttal. Your mic is not on. Can you hear me now, Your Honor? Now I can hear you. Apologize for that. Your Honor, this court has given a hierarchy of how to treat different physicians and non-physicians, medical providers. The highest level of regard is to the treating specialist, in this case with Dr. Compton. Dr. Compton did say in his reports that he evaluated Mr. Ballou, that Mr. Ballou had joint pain, nausea, vomiting, organ pain, fatigue, diarrhea, dizziness, headaches, and an inability to tolerate hot weather. Dr. Compton said these were all symptoms consistent with up. This was contrary to what Dr. Lebeau said. Interestingly enough, I haven't seen any cases in the Ninth Circuit that even talk about a doctor that's not reviewed any of the record. He didn't just review part of the record, he reviewed none of the record. The ALJ started the hearing by saying he'd had a telephone call with Dr. Lebeau who had had a technical difficulty and couldn't get in the record, so he was going to try to see if he could review it while we took the testimony of Mr. Ballou. We took the testimony of Mr. Ballou, it took about a half an hour. During that time, when Dr. Lebeau got on the phone, he says, this is when I studied up. He called it a different disease at first and the judge had to correct him and say, don't you mean up? And he goes, oh yeah, up. And at first he said, it's not a rare disease. And then later he corrected and says, yes, it is a rare disease. It only happens in one with 200,000 people. Then he said it doesn't affect any pain as far as joints, organs, muscle skeletal, which Dr. Compton, the treating dermatologist, clearly rejected. The ALJ not only said that those symptoms that Dr. Lebeau said were consistent with up, the bone pain and the organ pain rejected those, but he rejected all symptoms of Mr. Ballou as being inconsistent with up because that's what his mind, what he thought Dr. Lebeau had said, but clearly Dr. Lebeau never said that. So what relief are you asking us to give you or your client? We're asking that our client's testimony be credited as true because he is credible. It was interesting because Dr. Sawyer made a big deal of the psychiatrist that he was a credible individual. He was, his history was accurate. He came forth as believable, no evidence of malingering. So based on that and the errors that the ALJ met, the ALJ gave five reasons to the spread of the claimant. The federal district court discounted three of them and said those were clear errors. We believe the other two that the federal court said weren't errors, were errors. And even if there were only three or five, the standard is not, is there one that's remaining? The standard is based upon the complete record. Would any reasonable ALJ have concluded otherwise? And yes, they would. And that's in stout in the Ninth Circuit case. So the federal court used the improper standard just to say as long as there's one valid reason, that's good enough. Second, because so many doctors testified that he would miss work and his physician's assistant opined that he would, that that would, accrediting those shows that he would be disabled and that therefore we're asking for a payment of benefits. In the alternative, we're asking for a remand for additional proceedings, but primarily we're asking for an immediate award of benefits on remand. Counsel, I'm afraid you're, you're over the extended time that we gave you. So you should bring your argument to a close, please. Yes. Yes, I'm done, Your Honor. And thank you very much. I appreciate your attention and the opportunity to appear before you today. Okay, well, thank you. Unless one of my colleagues has a question, the case of Ballou v. Saul shall now be submitted and the parties will hear from us in due course. I just want to again say that I really appreciate the efforts of the advocates in the current circumstances and we appreciate the excellent advocacy on both sides of the case. Thank you.
judges: Gilman, Gould, Miller